IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **elenapendergrass777@gmail.com** THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 25-sw-877 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Alissa Thayer, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with **elenapendergrass777@gmail.com** (hereinafter the "Account"), an email account that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and I have been so employed since 2023. I am currently assigned to the Washington Field Office Child Exploitation

and Human Trafficking Task Force located at the Northern Virginia Resident Agency. As part of my duties as an FBI agent, I am responsible for investigating the possession of child pornography, distribution of child pornography, receipt of child pornography, production of child pornography, commercial sexual exploitation of minors, violations of the International Parental Kidnapping Crime Act, and human trafficking of minors and adults. As a result of my training and experience, I am familiar with the tactics, methods, and techniques utilized by those who commit such crimes. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3. I have participated in the investigation of the offenses set forth below. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from other law enforcement officers and witnesses. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. However, I have not intentionally excluded any information known to me that I believe would defeat a determination of probable cause.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that an ongoing violation of 18 U.S.C. § 1204(a), international parental kidnapping, has been committed, and continues to be committed, by Elena Pendergrass, also known as "Elena Stukalkina" and "Elena Stukalkana" (hereinafter, "Pendergrass"). There is also probable cause to search the information described in Attachment A for evidence of this crime, as further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. On May 21, 2025, Elena Pendergrass ("Pendergrass") gave birth to a daughter, A.S., in Alexandria, Virginia. At the time, Pendergrass was residing in Fairfax County, Virginia and Charles Hash ("Hash"), A.S.'s father, was residing in Saint Mary's County, Maryland.

7. Pendergrass and Hash, who had been in a domestic partnership, but were never legally married, separated prior to the birth of their daughter. At various times throughout the pregnancy, the two communicated through email, with Pendergrass using the Account and Hash using the email address anthonyhash@hashconstruction.com. During many of these communications, Pendergrass either implicitly or explicitly acknowledged Hash as the child's father. In one thread from November 4, 2024, for example, Pendergrass referred to the unborn child as being theirs (referring to "our child").

8. Prior to A.S.'s birth, Hash ultimately established paternity for the child via buccal swab and Pendergrass's blood liquid. On December 4, 2024, Hash sent the results from the DNA Diagnostics Center, which reflected a probability of paternity greater than 99.9%, to Pendergrass at the Account.

9. In February 2025, the former couple's relationship took what appears to be an irrevocable turn for the worse, after Hash called the police to report his fears that Pendergrass was suicidal. Specifically, on February 8, 2025, Pendergrass sent Hash a text message with a tearful

video of herself for him to send to her minor son (of no blood relation to Hash) in the event that she followed through with taking her own life by swallowing a remaining supply of previously prescribed Ambien pills. Out of concern for her safety—and that of his unborn child—Hash called the police, and Pendergrass was taken to the hospital for a psychiatric evaluation.

10. After meeting with the government on October 14, 2025, Hash forwarded emails that Pendergrass sent him after the February 8th incident. In these emails, Pendergrass expressed her anger towards him for perceived betrayals, including his having called the police. Pendergrass attributed Hash's decision to call the police—and to otherwise communicate with her ex-husband and the father of her minor son—as having negatively impacted her custody arrangement with her son. For example, in an email dated February 20, 2025, Pendergrass wrote: "[Y]ou would be the one to blame if I lose this [custody] case and I hope it gives you great joy to know you are responsible for [her son] not having a mother in his life!!!" In another email from February 2025, Pendergrass wrote: "You are going to pray you never met me."

11. As Pendergrass was nearing her due date, on April 30, 2025, Hash sent Pendergrass a request for the two of them to set up a Facetime call for the purpose of creating a parenting plan and a birthing plan. Pendergrass responded with a demand that he no longer attempt to communicate with her.

12. Despite knowing that Hash had established paternity, and herself referring to Hash as being A.S.'s father, upon A.S.'s birth in May 2025, Pendergrass did not list a father on A.S.'s birth certificate.

13. On June 11, 2025, Hash filed petitions for paternity and visitation, as well as an emergency motion for custody of A.S. A hearing on the emergency motion was scheduled for July 2, 2025. On June 23, 2025, Pendergrass entered a Calendar Control Notice requesting a

continuance of the July 2nd hearing. In that notice, she listed the Account as her email address. The next day, June 24, 2025, Pendergrass and Hash attended a hearing via telephone with the Fairfax County Juvenile and Domestic Relations Court to discuss Pendergrass's requested continuance.

14. On or about June 27, 2025, Pendergrass drove from her apartment located in the Eastern District of Virginia to the John F. Kennedy International Airport to attend an emergency passport appointment for A.S. In support of her application for A.S.'s passport, Pendergrass submitted A.S.'s birth certificate, which reflected only herself as A.S.'s parent. The email listed to check the status of the application was the Account. A passport was issued the same day for A.S.

15. On June 28, 2025, Pendergrass and A.S. flew from the John F. Kennedy International Airport to Istanbul, Turkey, and from there, to Kazakhstan. Their presence on the flight to Istanbul was confirmed by United States Customs and Border Protection flight manifests. It is believed Pendergrass and A.S. continued on from Kazakhstan to Russia: Pendergrass's native country. However, this cannot be fully verified.

16. A.S. neither sought nor obtained Hash's permission to travel with A.S. outside of the United States.

17. Thirty minutes before the July 2, 2025 emergency custody hearing at the Fairfax County Juvenile and Domestic Relations District Court, Pendergrass called the court's clerk's office stating that she would not be at the hearing because A.S. was sick. Unaware that Pendergrass had left with country with A.S., when she failed to appear at the hearing, the court attempted to contact her multiple times, all of which went unanswered. At this hearing, the court awarded "TEMPORARY SOLE LEGAL AND PRIMARY PHYSICAL CUSTODY" of A.S. to Hash.

18. On July 3, 2025, a text exchange between Pendergrass and Hash occurred. Pendergrass asked what happened at court the day before and requested that Hash provide her with

a copy of the order issued by the judge. Hash provided her with photographs of the order issued by the court on July 2, 2025, and requested confirmation that she received the information. Pendergrass replied to this message with a "thumbs up" emoji.

19. On July 13, 2025, Pendergrass flew from Doha, Qatar to the John F. Kennedy International Airport. At that time, Pendergrass was aware that the Fairfax County Juvenile and Domestic Relations District Court order awarded temporary physical custody to Hash, but she traveled back to the United States without A.S. Her presence on the flight to the United States was confirmed by a United States Customs and Border Protection flight manifest. A.S. was not listed on the flight manifest as being on board.

20. The FBI learned that Pendergrass booked a flight out of John F. Kennedy International Airport for July 15, 2025, departing at 11:20 AM. At approximately 10:45 AM on July 15, 2025, before Pendergrass could board her flight, agents from the New York Field Office conducted a probable cause arrest at John F. Kennedy International Airport. A.S. was not present at the airport.

21. On July 15, 2025, the government obtained a search warrant for the contents of Pendergrass's phone. *See* 1:25-sw-683.

22. A preservation request was sent to Google for the Account on July 17, 2025.

23. On September 10, 2025, the defendant was indicted. Trial is set for December 10, 2025.

## BACKGROUND CONCERNING GOOGLE[1]

24. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

25. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

26. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

27. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

28. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

29. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

30. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the

Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

31. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

32. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element. In this case, the anticipated emails will establish Pendergrass's conduct of behavior in refusing to provide Hash with the lawful access to his child as provided for in the Temporary Custody Order and her knowledge that a custody hearing was upcoming, suggesting her motivation in leaving, as she did, on June 28, 2025, without having notified the District Court or Hash in advance.

33. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity,

including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

34. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

35. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, as explained above, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

36. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and

experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

37. Based on the forgoing, I request that the Court issue the proposed search warrant.

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

ALISSA THAYER Digitally signed by ALISSA THAYER Date: 2025.10.23 12:44:30 -04'00'

Alissa Thayer
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me by telephone in accordance with Fed. R. Crim. P. 4.1 and 41(d)(3) on October 24, 2025

Lindsey R Vaala Digitally signed by Lindsey R Vaala Date: 2025.10.24 12:26:27 -04'00'

Honorable Lindsey R. Vaala
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the email account **elenapendergrass777@gmail.com** ("the Account") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

# ATTACHMENT B

## Particular Things to be Seized

## I. Information to be disclosed by Google LLC ("Google")

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on July 17, 2025, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. The contents of all emails associated with the account and exchanged with anthonyhash@hashconstruction.com from **November 4, 2024** through and including **July 15, 2025**; the contents of all other emails associated with the account from **June 11, 2025** through and including **July 15, 2025**, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, IP address, the date and time at which each email was sent, the size and length of each email, and any attached emails or videos;

b. Records of user activity for each connection made to or from the Account, including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity log from **November 4, 2024 to July 15, 2025**;

c. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address

used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number) from **November 4, 2024 to July 15, 2025**;

d. Location history, GPS data, and accounts recorded in a geographic area at a discrete time, from **June 24, 2025** through the end of the day on **July 15, 2025**;

e. Search and browsing history from **June 11, 2025** through the end of the day on **July 15, 2025**;

f. The types of service utilized from **November 4, 2024 to July 15, 2025**;

g. All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files from **November 4, 2024 to July 15, 2025**; and

h. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken from **November 4, 2024 to July 15, 2025**.

The Provider is hereby ordered to disclose the above information to the government within **10 days** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1204(a), international parental kidnapping, those violations involving Elena Pendergrass, also known as "Elena Stukalkina" and "Elena Stukalkana," ("Pendergrass") for each Account or identifier listed on Attachment A, information pertaining to the following matters:

a. The contents of all emails associated with the account and exchanged with anthonyhash@hashconstruction.com indicating the Account owner's state of mind as it relates to the crime under investigation and events leading up to the same, from **November 4, 2024** through and including **July 15, 2025**;

b. Preparatory steps Pendergrass took to carry out her removal of their shared child from the United States occurring on or after **May 21, 2025** through **July 15, 2025**, including:

   i. Communications with the Department of State regarding obtaining a passport or passport appointment for A.S.; and

   ii. Communications or records concerning travel for Pendergrass and/or A.S. to New York, Turkey, Qatar, Kazakhstan, and/or Russia.

c. Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner from **November 4, 2024** through and including **July 15, 2025**;

d. Evidence indicating the Account owner's state of mind as it relates to the crime under investigation from **November 4, 2024** through and including **July 15, 2025**;

e. The identity of the person(s) who created or used the Account from **November 4, 2024** through and including **July 15, 2025**;

f. Location history, GPS data, and accounts recorded in a geographic area at a discrete time, from **June 24, 2025** through the end of the day on **July 15, 2025**;

g. Search and browsing history from **June 11, 2025** through the end of the day **on July 15, 2025** that pertain to the crime under investigation.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits,

and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized materials, that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by [[**CHOOSE APPLICABLE:** Google LLC **AND/OR** Google Payment Corporation]] ("Google"), and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google. The attached records consist of ______________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b. such records were generated by Google's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

| | |
|---|---|
| ____________________ | ________________________________ |
| Date | Signature |